## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Jane Doe; K.R., by his next friends and parents, Rebecca Rooker and Jim Rooker; D.F., by his next friends and parents, Burnetta Frei and Jeffrey Frei; B.G., by her next friend and parent, Marty Geldert; and D.M.-B., by his next friends and parents, Michael McGee and Jason Backes; | **Civil No. _____** |
| Plaintiffs, | **COMPLAINT**<br><br>**JURY DEMAND** |
| vs. | |
| Anoka-Hennepin School District No. 11; Anoka-Hennepin School Board; Dennis Carlson, Michael Farley, Jerri McGonigal, and Tom Hagerty, in their official capacities, | |
| Defendants. | |

COME NOW Plaintiffs Jane Doe; K.R., by his next friends and parents, Rebecca Rooker and Jim Rooker; D.F., by his next friends and parents, Burnetta Frei and Jeffrey Frei; B.G., by her next friend and parent, Marty Geldert; and D.M.-B., by his next friends and parents, Michael McGee and Jason Backes, (collectively "Plaintiffs") and state the following as and for their Complaint against Defendants Anoka-Hennepin School District No. 11 (the "School District" or "District"), Anoka-Hennepin School Board, Dennis Carlson, Michael Farley, Jerri McGonigal, and Tom Hagerty (collectively "Defendants").

## PRELIMINARY STATEMENT

1.      This is a civil rights case brought by five current and former students of Defendant Anoka-Hennepin School District No. 11 in Minnesota.  Plaintiffs seek to vindicate their constitutional and statutory rights to equal access to educational opportunities, rights that Defendants have violated and will continue to violate absent relief from this Court.  Defendants' violation of these rights include the intentional enactment and enforcement of policies that unlawfully discriminate against Plaintiffs based on their actual or perceived sexual orientation.  These policies exist only because of community animus toward lesbian, gay, bisexual, and transgender ("LGBT")  people – an  interest that can never justify discrimination by the government.

2.      Plaintiffs have each suffered severe and pervasive gender-based harassment and/or harassment on the basis of their actual or perceived sexual orientation at school, in some cases for years on end.  Plaintiffs were subjected to slurs from other students because of Plaintiffs' perceived sexual orientation or gender expression, including "dyke," "homo," "fag," "faggot," and "queer," nearly every school day.  The verbal harassment of Plaintiffs and other students who are or perceived to be LGBT also included being called a "sinner"; being told, "you're going to hell"; being told, "you're a guy – act like a guy"; being told to "get out of our school, fag"; and being told to "kill yourself" for being gay.

3.      The harassment suffered by Plaintiffs was not limited to verbal insults. Other students also physically threatened, and in some cases, attacked Plaintiffs because of their sexual orientation or failure to conform to sex stereotypes.  These attacks included being urinated on, being stabbed in the neck with a pencil, being choked, being pushed into walls, being shoved forcefully into lockers, having objects thrown at them in class, and having books knocked out of their hands,— acts often accompanied by anti-gay and gender-related slurs.

4.      These acts occurred on school grounds and some occurred in plain view of school officials.  Plaintiffs and their parents also regularly reported the harassment to school staff and administrators.

5.      Far from being isolated incidents, this type of verbal and physical abuse was a relentless and inescapable aspect of Plaintiffs' school experience.  The harassment caused Plaintiffs' grades to drop and led each of the Plaintiffs to stay home from school at times to avoid the constant harassment.  As a result of the harassment, several Plaintiffs have transferred to schools outside of the District and away from their friends and communities or withdrawn from school altogether.  Being ostracized, humiliated, threatened, and attacked as a daily routine at school also caused Plaintiffs to suffer serious emotional harm, including anxiety, anger, and depression, which led some of them to consider or attempt suicide.  Within a nine month period, between November 2009 and July 2010, at least four LGBT students within the District did take their own lives.

6.     Despite knowledge of the severe and pervasive anti-gay and gender-based harassment being suffered by Plaintiffs and other students throughout the District, Defendants response to the abuse was grossly inadequate.  Contrary to their obligations as school officials entrusted with the safety and education of *all* students, including vulnerable ones such as Plaintiffs, the response of District administrators and teachers was to ignore, minimize, dismiss, or some instances, to blame the victim for the other students' abusive behavior.  One Plaintiff was told to "lay low" when she notified an Associate Principal of the daily anti-gay abuse she suffered.  Another Plaintiff was told by a school official to "ignore" the harassment against him.  Similarly, a principal advised another Plaintiff who was being harassed to "try to stay out of people's way."  When school officials did take action, the action was painfully ineffective and in all too many instances extended to no more than telling the abusive students to "knock it off."

7.     The epidemic of anti-gay and gender-based harassment within District schools is rooted in and encouraged by official District-wide policies singling out and denigrating LGBT people.  For many years, these policies have deemed LGBT people, and them alone, as unworthy of being mentioned, let alone protected, in District classrooms.  In the mid-1990s, the District adopted a health curriculum policy prohibiting teachers from teaching that homosexuality is "normal" or a "valid lifestyle."  According to the anti-gay organization that lobbied the District to adopt that rule, such a policy was necessary because "[t]he homosexual lifestyle does not reflect the community standards of District #11, nor is it regarded as a norm in society."

8.      In 2009, the School Board amended and expanded the District's anti-gay policy to go beyond the health curriculum.  That revised policy is still in effect today. The so-called "Sexual Orientation Curriculum Policy" ("SOCP") states in relevant part: "Teaching about sexual orientation is not a part of the District adopted curriculum; rather, such matters are best addressed within individual family homes, churches, or community organizations.  Anoka-Hennepin staff, in the course of their professional duties, shall remain neutral on matters regarding sexual orientation including but not limited to student led discussions."  Written guidance from the District makes clear that the term "sexual orientation" in the SOCP is used as a synonym for LGBT people, and that the policy does not bar discussions of issues relating to heterosexual people.

9.      Despite its language the SOCP is not neutral.  In reality, the SOCP acts as a gag policy that prevents school officials from complying with their legal obligations to keep safe students like Plaintiffs who are perceived as LGBT or gender non-conforming. This gag policy requires District officials to enforce anti-harassment policies in the case of anti-LGBT bullying differently from other types of bullying.  Teachers have understood the SOCP as inhibiting them from aggressively responding to anti-gay harassment, inside or outside the classroom.  The gag policy also prohibits school staff from countering anti-gay stereotypes or presenting basic factual information about LGBT people, even when necessary to address anti-gay hostility within the student body.  For example, pursuant to District guidance, the SOCP prohibits staff from even mentioning the fact that it is the position of the American Psychological Association that being gay is

5

not a choice—a position that is the consensus of all major accredited and professional mental health organizations. The SOCP severely limits or outright bars *any* discussion by school officials of issues related to LGBT people in or out of the classroom, a limitation that is not placed on any other category of persons.

10.     The SOCP sends the unmistakable message to Plaintiffs and LGBT students throughout the District that they are not a welcome part of the school community and that their very existence is shameful and must be kept hidden. Both the implementation of the SOCP and its very existence perpetuate the hostile anti-LGBT climate within the District and enables abusive students to taunt and attack their LGBT classmates and those perceived as LGBT or gender non-conforming.

11.     Because of Plaintiffs' actual or perceived sexual orientation and gender expression, Defendants have been deliberately indifferent to the severe and pervasive anti-gay and gender-based harassment endured by the Plaintiffs and other students, and have failed to create adequate policies or procedures to protect Plaintiffs from the severe harassment and abuse they have suffered. They have failed to adequately train District staff to address and prevent that harassment, and have also failed to adequately inform students about any District policies—to the extent they exist—that purport to prohibit these types of harassment. Defendants have also intentionally discriminated against Plaintiffs by adopting policies and practices that require District staff to ignore or fail to adequately address harassment of students who are or are perceived to be LGBT and that restrict the remedial measures that the District, schools, or staff can take to address and

prevent such harassment.  Defendants knew or should have known that the lack of

adequate policies and training, and the District's affirmative policies prohibiting

discussion of LGBT people in the classroom, including the SOCP in particular,

significantly harmed Plaintiffs and other students and placed them at unreasonable risk of

future harm.

12.     Plaintiffs bring this suit to vindicate their rights under the Equal Protection

Clause of the Fourteenth Amendment to the United States Constitution, Title IX, and the

Minnesota Human Rights Act.  They seek relief in the form of compensatory and punitive

damages, as well as injunctive and declaratory relief to strike down the SOCP and other

District policies and practices that encourage and perpetuate the anti-gay and gender-

based harassment suffered by Plaintiffs and other students throughout the District.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over Plaintiffs' complaint pursuant to 28 U.S.C.

§§ 1331 and 1343 because the matters in controversy arise under the Constitution and

laws of the United States.  Jurisdiction is also proper over Plaintiffs' claims under 28

U.S.C. §§ 2201-2202 because Plaintiffs seek a declaration of their civil rights.  This

Court has supplemental jurisdiction over Plaintiffs' related state law claims under 29

U.S.C. § 1367(a) because those claims arise out of the same case or controversy as

Plaintiffs' federal claims.

14.     Venue is appropriate in this Court since one or more of the Defendants

reside within this Court's judicial district and a substantial part of the events or omissions

giving rise to the claims occurred within this judicial district, in accordance with 28 U.S.C. §1391(b).

## PARTIES

### Plaintiffs

15.     Plaintiff Jane Doe is an 18-year-old female.  She identifies as a lesbian. Jane Doe was a student at Anoka High School, a school within the District, from September 2007 to approximately late October 2010, when she dropped out of school because of the severe and pervasive anti-gay harassment that she was experiencing at Anoka High.   Jane Doe is a natural person, a current resident of Anoka County, and a citizen of the State of Minnesota.

16.     Plaintiff K.R. is a 14-year-old male and sues here by and through his next friends, parents, and guardians, Rebecca Rooker and Jim Rooker.  He does not identify as gay, but has been perceived as gay by other students because he does not conform to traditional stereotypes of masculinity.  K.R. was a student at Anoka Middle School for the Arts (formerly known as Fred Moore Middle School), a school within the District, from September 2008 until April 2011, when his parents transferred him to a school outside the District because of the severe and pervasive anti-gay and gender-based harassment that he was experiencing at school.  K.R. is a natural person, a current resident of Sherburne County, and a citizen of the State of Minnesota.

17.     Plaintiff D.F. is a 14-year-old male and sues here by and through his next friends, parents, and guardians, Brunetta Frei and Jeffrey Frei.  He identifies as gay.  D.F.

was a student at Anoka Middle School for the Arts, a school within the District, from September 2010 until June 2011.  D.F. previously attended Jackson Middle School, a school within the District, from September 2008 to February 2010.  D.F. will likely attend a high school within the District beginning in the 2011-2012 school year.  D.F. is a natural person, a current resident of Anoka County, and a citizen of the State of Minnesota.

18.     Plaintiff B.G. is a 14-year-old female and sues here by and through her next friend, parent, and guardian, Marty Geldert.  She identifies as bisexual.  B.G. attended Jackson Middle School, a school within the District, from February 2010 until June 2011, and Fred Moore Middle School (now known as Anoka Middle School for the Arts), a school within the District, from September 2008 until February 2010.  B.G. will start high school at Champlin Park High School, a school within the District, during the 2011-2012 school year.  B.G. is a natural person, a current resident of Hennepin County, and a citizen of the State of Minnesota.

19.     Plaintiff D.M.-B. is a 14-year-old male and sues here by and through his next friends, parents, and guardians, Michael McGee and Jason Backes.  He does not identify as gay, but has been perceived as gay by other students because he is being raised by a male, same-sex couple and because he participates in gymnastics, which is perceived as a "girls' sport."  D.M.-B. attended Jackson Middle School, a school within the District, from September 2008 until June 2011.  D.M.-B. will start high school at Champlin Park High School, a school within the District, during the 2011-2012 school year.  D.M.-B. is

a natural person, a current resident of Hennepin County, and a citizen of the State of Minnesota.

**Defendants**

20.     Defendant ANOKA-HENNEPIN SCHOOL DISTRICT NO. 11, an education corporation and existing pursuant to Minn. Stat. § 123A.55, *et seq.*, is a public independent school district in Anoka and Hennepin Counties, Minnesota.  The School District is a "person" within the meaning of 42 U.S.C. § 1983.  Upon information and belief, the School District and each of its component schools are recipients of federal financial assistance.  The School District is a non-sectarian public corporation and exempt from taxation pursuant to Minn. Stat. §§ 290.014 and 297A.70, Subd. 2(a)(1). Anoka High School, Anoka Middle School for the Arts, and Jackson Middle School are all schools in the School District.

21.     Defendant ANOKA-HENNEPIN SCHOOL BOARD (the "School Board" or "Board") is a public education corporation governing the School District pursuant to the laws of the State of Minnesota.  The School Board is a "person" within the meaning of 42 U.S.C. § 1983.  Upon information and belief, the Board receives federal financial assistance.

22.     Defendant DENNIS CARLSON ("Superintendent Carlson"), sued in his official capacity, is the current Superintendent of the School District.  He has held this position, first as interim Superintendent, since November 2008.  As Superintendent, he holds final policymaking authority for the School District with respect to the day-to-day

enforcement of the SOCP, equal opportunity, anti-harassment, and anti-bullying policies within the School District as its chief executive officer.  As Superintendent, he has the ability and authority to take corrective action on behalf of the School District to stop discrimination and harassment within the School District and to discipline perpetrators of such discrimination and harassment.  Superintendent Carlson is a natural person and, upon information and belief, resides in Minnesota.

23.     Defendant MICHAEL FARLEY ("Principal Farley"), sued in his official capacity, is Principal of Anoka High School.  He has held this position since 2008 and previously was Associate Principal of Anoka High School.  Principal Farley has final policymaking authority with respect to the day-to-day enforcement of the SOCP, equal opportunity, anti-harassment, and anti-bullying policies within Anoka High School as its Principal.  Principal Farley has the ability and authority to take corrective action on behalf of the School District to stop discrimination and harassment within Anoka High School and to discipline perpetrators of such discrimination and harassment.  Principal Farley is a natural person and, upon information and belief, resides in Minnesota.

24.     Defendant JERRI MCGONIGAL ("Interim Principal McGonigal"), sued in her official capacity, is Interim Principal of Anoka Middle School for the Arts.  Interim Principal McGonigal has final policymaking authority with respect to the day-to-day enforcement of the SOCP, equal opportunity, anti-harassment, and anti-bullying policies within Anoka Middle School for the Arts as its Interim Principal.  Interim Principal McGonigal has the ability and authority to take corrective action on behalf of the School

District to stop discrimination and harassment within Anoka Middle School for the Arts
and to discipline perpetrators of such discrimination and harassment.  Interim Principal
McGonigal is a natural person and, upon information and belief, resides in Minnesota.

25.    Defendant TOM HAGERTY ("Principal Hagerty"), sued in his official
capacity, is Principal of Jackson Middle School.  He has held this position since 2010 and
previously was Principal of Sandburg Middle School.  Principal Hagerty has final policy
making authority with respect to the day-to-day enforcement of the SOCP, equal
opportunity, anti-harassment, and anti-bullying policies within Jackson Middle School as
its Principal.  Principal Hagerty has the ability and authority to take corrective action on
behalf of the School District to stop discrimination and harassment within Jackson
Middle School and to discipline perpetrators of such discrimination and harassment.
Principal Hagerty is a natural person and, upon information and belief, resides in
Minnesota.

## STATEMENT OF FACTS

### Plaintiff Jane Doe

26.    Plaintiff  Jane Doe started at Anoka High School as a freshman in
September 2007.   Jane is an accomplished singer and was very involved in the school's
choir.  Until her identity as a lesbian was revealed,  Jane was generally well-liked by her
classmates.

27.    The severe and pervasive anti-gay harassment against Jane began in her
sophomore year when another student disclosed Jane's sexual orientation to others during

a choir trip to Wisconsin.  On the trip, another student searched Jane's cell phone without her permission and found a picture of Jane with her girlfriend.  Unbeknownst to Jane, the student forwarded the picture to other students in the choir, and the picture was subsequently forwarded to students throughout the 10th grade class and school.  Accompanying the photo was text stating, in effect "watch out for Jane, she's a lesbian – if she's rooming with you, she might try something."  Jane was humiliated by the distribution of the photo and accompanying text.

28.     The anti-gay harassment against Jane quickly exploded.  Whereas she had generally been accepted by her peers prior to the distribution of the photo, she was now regularly subject to anti-gay slurs in the hallways and in the classrooms.  In the hallways and in the classroom, students openly, and often in the presence of school officials, called Jane "dyke," "lesbo," "bitch," and "sinner," and told her that she was "going to hell."  As she passed by, students also loudly made anti-gay statements such as "there's a lesbian walking around," and "that girl over there is a dyke; she's with a fat bitch" (referring to her girlfriend).

29.     The anti-gay harassment against Jane soon escalated to physical threats and violence.  Students began throwing objects, like balls of paper and pencils, at Jane in the hallways and in the classroom.  Students also regularly pushed Jane in the hallways, and shoved her into lockers or against walls, sometimes in the clear view of teachers who took no action to stop the harassment.  Students would also knock the books out of her hands as she was walking between classes.  Often, these acts of physical aggression were

accompanied by slurs such as "sinner" and "dyke."  On one occasion toward the end of her sophomore year, Jane was waiting for her mother to pick her up after school, and a student she didn't know hurled Gatorade at her while calling her a "sinner," then walked away.  Jane was so upset that she stayed home from school the next day.

30.     Jane's choir classmates were particularly abusive to her.   In choir, Jane would often find her school folders vandalized with slurs like "dyke" and "bitch." Another student scratched out Jane's face, and only her face, in a photo of the choir that hung in the choir room.  By her junior year, some of the other choir students started making threats to physically attack Jane.  At least two of her classmates threatened Jane and told her, in effect, "if I ever find you alone, I'll beat the crap out of you."

31.     Because of the constant barrage of anti-gay insults and threats she faced at school, Jane tried not to go anywhere at school alone, and avoided school restrooms whenever possible.  In particular, she never used the choir restroom out of fear of being physically attacked.

32.     The verbal and physical abuse Jane suffered at school substantially interfered with her academic performance and her ability to attend school.  She spent many school nights crying.  On many days, she missed school altogether because of the physical threats against her.  As a consequence, Jane's grades dropped and her performance in choir suffered.  The abuse also caused her to develop anxiety and depression.

33.     School officials failed to take adequate measures to address the rampant anti-gay abuse against Jane.  Instead, school officials admonished Jane to better hide her sexual orientation.  At most, teachers occasionally told the other students to "knock it off."  For example, shortly after the incident involving the distribution of the photo, Jane informed her choir teacher, Lindsay Wichman, about what had happened.  Ms. Wichman's response was wholly ineffective, if not contributory to the harassment against Jane.  Rather than addressing the student who had harassed Jane, Ms. Wichman's response was to blame Jane for the student's malicious act, telling Jane, in effect, "This should be a lesson for you – you shouldn't have had that picture on your phone if you didn't want people to see those photos."

34.     When the choir returned home from the trip, Ms. Wichman had the class sit in a circle to "talk about their feelings."  The conversation turned into a diatribe against gay people.  At no time during this discussion did Ms. Wichman explain to the students that anti-gay harassment was inappropriate, against school or District policy, or subject to discipline.

35.     Ms. Wichman also told Jane that she had spoken to the school's police liaison about the incident, but the school police liaison didn't follow up with Jane about the harassment she had experienced.

36.     Moreover, although Jane's choir classmates routinely and openly mocked, threw objects at, and threatened Jane because of her sexual orientation, Ms. Wichman stood idly by and let the harassment continue.  Even though Jane asked Ms. Wichman on

multiple occasions to stop the harassment she was experiencing, whatever action, if any, was taken by Ms. Wichman was grossly inadequate because the harassment continued.

37.     Other school officials were similarly indifferent to the anti-gay harassment against Jane.  As had Ms. Wichman, Joseph Osowski, the school's choir teacher for the 11th and 12th grade choir classes, regularly observed verbal and physical anti-gay abuse against Jane that was occurring in choir class.  On at least one occasion, Jane informed Mr. Osowski about the anti-gay harassment that she had experienced in previous years, and told him about the ongoing verbal and physical threats against her.  Despite that conversation and his observation of the harassment firsthand, to Jane's knowledge, Mr. Osowski did not take any action to address the abuse other than telling students, in effect, "knock it off – that's not allowed in my classroom" and occasionally lecturing students in a general way about "drama" and bullying.  These actions failed to stop or diminish in any meaningful way the harassment against Jane.

38.     On one occasion toward the end of Jane's tenth grade year, when the abuse was getting more and more out of control, she made an appointment to talk to Anoka High School Associate Principal Bill Krohn.  During that appointment, she told him about the constant anti-gay slurs and physical threats being made against her at school.  She also told him about Ms. Wichman's failure to take adequate measures to address the abuse she was enduring in choir class.  Associate Principal Krohn's response was to advise Jane to "lay low" and to not be so public about her sexual orientation.  To Jane's knowledge, Associate Principal Krohn's response was that he would look at video from

security cameras but that Jane should lay low and not be so public about her sexual orientation.

39.     Given the unremitting, worsening abuse she was enduring at school and her growing hopelessness about the school's willingness to stop the harassment, Jane stopped attending classes at Anoka High School in October 2010, two months into her senior year.

40.     Approximately one week after leaving school, Jane attempted to take her own life.  She spent a week in the psychiatric ward of a Minneapolis hospital.  While Jane was in the hospital recovering from her suicide attempt, she told her mother about the relentless anti-gay harassment that she had been enduring at school.  Her mother subsequently called Defendant Anoka High School Principal Michael Farley and a number of Jane's teachers to discuss the anti-gay harassment that Jane had experienced at Anoka High School.

41.     In late November or early December 2010, Jane and her mother met with Principal Farley to discuss the abusive environment at school for Jane.  Jane and her mother explained to Principal Farley that Jane wanted to re-enroll so she could graduate from high school, but only if the school administration was willing to take effective measures to address the anti-gay atmosphere at Anoka High School.

42.     In the meeting, Principal Farley claimed that there was no record of anything Jane had reported to teachers or any record of her conversation with Assistant Principal Krohn.  He also said that the school's police liaison had no documentation or

17

recollection of the choir teacher, Ms. Wichman, reporting anything about the cell phone photo incident.

43.     After the meeting with Principal Farley, Jane felt hopeless about the possibility that the school would ever take serious action to protect her from anti-gay harassment at Anoka High School.  Because of the indifferent response by Principal Farley and other school officials to the harassment that Jane was suffering at school, Jane did not re-enroll at Anoka.  Instead, she completed her studies through an online high school and graduated in June 2011.

44.     Anoka High School and the District have made no adequate effort to educate staff about issues of harassment of LGBT students or students perceived as LGBT or gender non-conforming.

45.     At no time during Jane's tenure at Anoka High School or the District, did the school or the District conduct adequate training for students, teachers, or administrators addressing harassment of LGBT students or students perceived to be LGBT or gender non-conforming.

**Plaintiff K.R.**

46.     Plaintiff K.R. attended Anoka Middle School for the Arts ("Anoka Middle School"), formerly known as Fred Moore Middle School, from September 2008 until he transferred to another school outside the District in April 2011.

47.     K.R. does not identify as gay, but is perceived as gay and as insufficiently masculine by his classmates in part because he likes to sing songs by female artists like

Cher and Lady Gaga.  K.R. also wears gender non-conforming clothing, such as brightly colored scarves and sparkly red high-heeled shoes.  He occasionally wears the scarves over his head like long hair.

48.      While he was a student at Anoka Middle School, K.R. was subjected to severe and pervasive harassment based on his perceived sexual orientation and failure to conform to sex stereotypes.  K.R. was a target for other students to harass and intimidate. Students regularly called him "fag" as he was passing by them in the hallways and told him things like "you're so gay," and "you dress gay."  Students also regularly insulted K.R. because he liked to sing "girl songs."  One time, K.R. brought his "Cher purse" to school to show his teacher.  One boy said, "nice purse," and his group of friends all laughed.  Then the boy told K.R., "you're a guy—act like it."

49.      One student was especially aggressive in bullying K.R. because of his perceived sexual orientation and failure to conform to sex stereotypes.  Beginning in the sixth grade, this student frequently called K.R. names such as "ugly-ass bitch" and threatened to "punch [him] in the face."  The harassment was not limited to verbal insults and threats—on various occasions, the student physically attacked K.R. by slapping him in the face, shoving him against a brick wall, or by shoving him into lockers.  In seventh grade, K.R. was shoved down the stairs by an eighth grader.  The eighth grader threatened K.R.'s life saying, "if you tell anyone about this, I'll fucking kill you."

50.      Anoka Middle School officials were aware of the harassment against K.R., but failed to take anything but minimal action to address it.  Instead of addressing the

students who were being abusive to K.R., school officials commonly isolated K.R. from other students, further drawing attention to him and making him a target for other students, or to minimize the incident altogether. For example, once when K.R. was using the bathroom, he felt a liquid showering his clothes and body. He looked up and saw a stream of urine falling on him while some boys outside the stall laughed at him. K.R. was extremely upset at being urinated on. He was late to class, and told the teacher he needed to go to the principal's office. When K.R. informed Associate Principal Denise Collins about what had happened, she told him, "it was probably water." Instead of asking him the identity of the student who had urinated on him, Associate Principal Collins told K.R. that he should just use the nurse's restroom. Later, when he tried to use the nurse's restroom, he was reprimanded by school staff.

51.     Similarly, when K.R. reported to school officials that he was being harassed in the gym locker room by other students, the school's response was to have K.R. change clothes in Associate Principal Collins' office, not to address the students who were harassing him.

52.     On another occasion, K.R. was sitting in a classroom when a student behind him said, "you're a fag!" and shoved K.R. K.R. swung back and they started fighting. K.R. started screaming for help. K.R. saw the teacher watching the entire incident, but she just stood there, even though other students ran to her for help. K.R. eventually ran out of the room and reported the incident to Associate Principal Collins.

53.     K.R.'s mother, Rebecca, repeatedly reported her concerns about K.R.'s safety to school officials, also to little or no effect.  At certain points in the school year, Rebecca was in contact with school officials as often as once a week to discuss the anti-gay and gender-based harassment against K.R.  In addition to Associate Principal Collins, Rebecca reported the harassment against K.R. to then-Principal Katherine Baufield, teacher Lois Cranston, and teacher Holly Schmidt.  Despite Rebecca's ongoing reports of the hostile climate against K.R. and her repeated request that the school conduct diversity training, at no time during K.R.'s tenure at Anoka Middle School did the school or the District conduct adequate training for students, teachers, or school administrators addressing harassment of LGBT students or students perceived to be LGBT or gender non-conforming.

54.     Sometime around mid-February 2011, after K.R. had suffered years of harassment, school officials assigned "paras" – District terminology for para-professionals, school staff who serve essentially as teacher's aides – to escort K.R. in the hallways.  Initially, K.R. enjoyed having the paras escort him, but shortly discovered that the escorts did not stop the harassment against him.  K.R. was still called names and occasionally shoved in the hallways.  Moreover, some of the paras treated K.R. as if the assignment of escorts was intended to punish, as opposed to protect, him.  On several occasions, the para escorting K.R. forgot or stranded him in the hallways, which caused K.R. to miss some school activities.  On one occasion, K.R. was shoved by another

student in the presence of a para named Eva Karp.  K.R. complained to Ms. Karp, but she refused to take any action, saying that the other student was not her responsibility.

55.     In April 2011, K.R.'s parents concluded that the harassment against him had become intolerable, and transferred him to a school in another district.  Since transferring to his new school K.R. has not been targeted for harassment because of his perceived sexual orientation or gender expression.  He feels safe and happy at school for the first time in years.

56.     Anoka Middle School and the District have made no adequate effort to educate staff about issues of harassment of LGBT students or students perceived as LGBT or gender non-conforming.

**Plaintiff D.F.**

57.     D.F. was a student at Anoka Middle School for the Arts, a school within the District, from September 2010 until June 2011.  D.F. previously attended Jackson Middle School, a school within the District, from September 2008 to February 2010.  D.F. identifies as gay and some of his classmates perceive him as insufficiently masculine because he does not participate in stereotypically masculine activities such as sports.

58.     D.F. has been subject to harassment because of his sexual orientation and gender nonconformity at three different schools within the District.  The anti-gay and gender based harassment against D.F. began in the fifth grade at Riverview Elementary School when other students began calling him a "fag."  D.F. told his teacher, who instructed the entire class to stop using the word "fag."  Although the teacher's warning

was effective with respect to that particular class, the harassment against D.F. continued and intensified into the sixth grade when he began attending Jackson Middle School.  At Jackson Middle School, students regularly shouted slurs at him like "fag," "fat boy," and "wimp."

59.     D.F. regularly reported the harassment to teachers and other school officials when it occurred and eventually began to meet weekly with his school counselor, Amy Storrick.  Ms. Storrick told D.F. that she would talk to D.F.'s harassers, but the situation did not improve for him.  D.F. also reported the harassment and abuse to Associate Principal Anita Udager.  At one point during his sixth grade year, Ms. Storrick asked Associate Principal Udager for assistance in addressing the harassment against D.F.  D.F. met with Associate Principal Udager and Ms. Storrick on multiple occasions during his sixth grade to discuss the anti-gay harassment against him.  During the meetings, Ms. Udager and Ms. Storrick identified steps designed to remedy the harassment against D.F., such as having school officials talk to D.F.'s harassers.  Any actions that were implemented were grossly inadequate, as D.F. continued to be harassed by his peers.

60.     Because of the harassment, and the school's tepid response, D.F. cried at home regularly.  He did not feel safe at school.  The harassment negatively affected his school work and grades and his emotional well-being.  He began to have serious anger issues and to throw tantrums at home as a result of his anxiety and frustration around the harassment.

61.     Seventh grade was the most intense year of harassment for D.F., and the harassment became a daily—if not hourly—facet of D.F.'s life at school.  D.F. informed his teacher, Ms. Anderson, that a particular student was frequently harassing him in her class.  On several occasions, the student threw notes at him that said, "get out of our school fag" and "we don't want a fag living here."  When the teacher saw the notes she merely threw them away.

62.     Ms. Anderson's response was not the only time that school officials ignored the harassment against D.F.  For example, on one occasion during the eighth grade, a student pushed him hard into a locker.  D.F. promptly told Associate Principal Gwen Dillenburg, who responded that there was nothing she could do and advised D.F. to "try to stay out of people's way."

63.     In seventh grade, D.F. continued to meet with a school counselor, Kim Kesti, on a weekly basis.  D.F. regularly reported the harassment to Ms. Kesti during those meetings.  On multiple occasions, D.F. met with Ms. Kesti and Associate Principal Udager together, and they discussed the harassment he was experiencing.  At one point, at Ms. Kesti's request, D.F. made a list of the students who were harassing him.  He recalls that he filled two pages with names of students who were harassing him.  Despite providing these names, D.F. continued to be harassed.

64.     During the winter of his seventh grade year, D.F. and his parents met with Associate Principal Brian Carlson and Ms. Kesti, his counselor.  D.F.'s parents initiated the meeting to discuss D.F.'s harassment.  Associate Principal Carlson suggested that

D.F. spend some time away from school for his own safety.  Administrators also suggested that D.F. transfer to an alternative school because he remained unsafe at Jackson Middle School.  D.F.'s parents decided against that proposal because they viewed the alternative school as a place for troubled students.  But they reluctantly agreed to keep D.F. home for a few days before a scheduled break.

65.     D.F. was shocked and angered that school officials asked him to stay home and miss school as a means of addressing the harassment against him.  His parents were also frustrated that the school district was unable to do more to protect D.F.

66.     About that same time, D.F. began taking medication for depression.

67.     For the eighth grade, D.F. changed schools and began attending Anoka Middle School for the Arts.  Despite changing schools, D.F. continued to be called a "fag" because of his failure to conform to sex stereotypes.  He was also called other anti-gay names and students sometimes made crude hand gestures at him.  When he was harassed, D.F. promptly told a teacher.

68.     In addition to the regular verbal harassment, D.F. was at times subject to physical harassment.  On one occasion, he was attacked by another student when they were alone in the restroom.  The student pulled D.F.'s hair and hit him hard in the head with what appeared to be a day planner.

69.     The attack left D.F. with significant head pain.  D.F. went to the administration office where he told the secretary that he just got attacked in the bathroom and his head was hurting.  Although it was during school hours, the secretary told him no

one was available to help him and he could come back the next day.  The next day when

D.F. spoke with Associate Principal Gwen Dillenburg, she declined to take action

because she claimed that D.F. had no proof that the incident had occurred.  Associate

Principal Dillenburg also told D.F. that he was "exaggerating" what had happened.

70.     D.F. also regularly reported the abuse and harassment he experienced to

math teacher Carissa Simonet, social studies teacher Abbey Engerbretson, chorus teacher

Ms. Morgan, and math teacher Matthew Polich.  Despite school officials' knowledge of

the verbal and physical attacks against him, the harassment against D.F. continued, and

he often was afraid to go to school.  D.F. plans to begin high school within the District

this fall, but he is fearful of the harassment he expects to encounter.

71.     Anoka Middle School, Jackson Middle School, and the District have made

no adequate effort to educate staff about issues of harassment of LGBT students or

students perceived as LGBT or gender non-conforming.

72.     At no time during D.F.'s tenure at Anoka Middle School and Jackson

Middle School did the school or the District conduct adequate training for students,

teachers, or administrators addressing harassment of LGBT students or students perceived

to be LGBT or gender non-conforming.

**Plaintiff B.G.**

73.     B.G. attended Fred Moore Middle School (now Anoka Middle School for

the Arts) from September 2008 until February 2010 and Jackson Middle School from

February 2010 until June 2011.  B.G. recently completed the eighth grade and plans to start high school in the fall at Champlin Park High School within the District.

74.     B.G. describes herself as openly bisexual and gender-non-conforming.  By her own description, B.G.'s mannerisms and clothing are "very tomboyish" and "not girly."

75.     At Fred Moore Middle School, B.G. experienced regular verbal harassment from other students because of her failure to conform to gender stereotypes and the perception that she is bisexual or a lesbian.  She was frequently called names such as "dyke," "whore," and "gay."

76.     B.G. reported the harassment against her to school officials at Fred Moore Middle School on at least 30 separate occasions, to little or no effect.  For example, B.G. repeatedly told the Principal of Fred Moore Middle School, Katherine Baufield, about the harassment she experienced.  Principal Baufield would commonly respond by giving B.G. suggestions for how to ignore the harassment or how B.G. could respond with a "comeback" to the insult.  Despite Principal Baufield's "advice," the harassment against B.G. continued unabated.  Similarly, on the times when B.G. reported the harassment to the school's assistant principals because Principal Baufield was not available, they failed to stop the abusive students' behaviors toward B.G.

77.     The harassment against B.G. intensified following the November 2009 suicide of Samantha Johnson, another female student and a friend of B.G.'s, who was also perceived as a lesbian and gender non-conforming.  In response to the tragedy, many

students blamed B.G. for Samantha's death and made comments to B.G. such as, "why don't you go kill yourself, too?"  When B.G. reported to a school counselor the other students' remarks and insults, the counselor responded by telling B.G. that she should just ignore the harassment, or tell B.G. that she was "pretty" in a misguided attempt to help B.G. feel better.

78.     Because of the pervasive harassment and abuse she was experiencing at Fred Moore Middle School, B.G. transferred to Jackson Middle School in February 2010, in the middle of her seventh-grade year.

79.     The harassment against B.G. because of her perceived sexual orientation and her gender non-conformity did not stop.  At Jackson Middle School, students frequently called her names such as "dyke," "queer," "faggot," "guy," "freak," "transvestite," "bitch," "cunt," "slut," "whore," "skank," "prostitute," and "hooker," often in front of teachers who failed to take any action to stop the harassment.  Students at Jackson Middle School also told B.G. that she should "kill herself," apparently in reference to recent suicides of LGBT students in the District.

80.     B.G. was also physically harassed by other students.  For example, during the 2010-2011 school year, other students tripped her at school multiple times, pushed her into a trash can once, and pushed her into a locker three times.

81.     B.G. repeatedly informed her school counselor at Jackson Middle School, Kim Kesti, about the harassment.

82.     The first incident of harassment that B.G. reported to Ms. Kesti involved a male student making an obscene gesture toward her in the computer lab, flicking his tongue between two fingers, an apparent reference to lesbian sexual acts.  Ms. Kesti asked B.G. who the student was, and B.G. told her.  Whatever action, if any, Ms. Kesti took was grossly inadequate as the student continued to harass B.G.

83.     B.G. also informed Associate Principal Anita Udager about the harassment she experienced after a group of students attempted to push her into a trash can, causing an abrasion on her back.  Associate Principal Udager asked for the names of the students who had tried to push her into the garbage can, but B.G. did not know their names. Associate Principal Udager said she would "keep an eye out," but to B.G.'s knowledge she took no other action to protect B.G. from further harassment.

84.     As a result of the continued harassment, B.G.'s grades went down and she suffered and continues to suffer from low self-esteem, anger, anxiety, depression, and suicidal ideation.  She was hospitalized for at least one week in spring of 2010 and spent a month away from school in a full-time outpatient program from approximately March 23 to April 23, 2011 to address those mental health issues.

85.     Fred Moore, Jackson Middle School, and the District have made no adequate effort to educate staff about issues of harassment of LGBT students or students perceived as LGBT or gender non-conforming.

86.     At no time during B.G.'s tenure at Fred Moore or Jackson Middle School did school officials conduct adequate training for students, teachers, or administrators

addressing harassment of LGBT students or students perceived to be LGBT or gender non-conforming.

**Plaintiff D.M.-B.**

87.   Plaintiff D.M.-B. attended Jackson Middle School from September 2008 to June 2011.  D.M.-B.'s parents are Michael McGee and Jason Backes, a same-sex couple. Although D.M.-B. identifies as straight, he is often perceived as gay by other students because his fathers are gay and because he is small for his age and participates in gymnastics, which some of his classmates perceive as a "girls' sport."

88.   D.M.-B.'s harassment began in the fifth grade, when he was a student at Champlin Elementary School. One student in particular, D.G., regularly harassed D.M.-B., accusing him of being gay.  D.M.-B.'s parents complained to school officials many times about the harassment, including several telephone conversations with the Principal, Neil Klund-Schubert.  School officials said that they would take care of the problem. They failed to do so, and despite continued complaints from D.M.-B.'s parents the boys were not effectively separated until near the end of D.M.-B.'s sixth grade year.

89.   In sixth grade, D.M.-B. began attending Jackson Middle School, along with his primary harasser D.G.

90.   Around the start of D.M.-B.'s sixth grade year, D.M.-B.'s parents had several conversations with Jackson Middle School staff including guidance counselor Kim Kesti and then-Principal Tom Sullivan.  In those communications, D.M.-B.'s parents

mentioned that their family had two fathers and expressed concern that D.M.-B. would continue to be a target of harassment. They asked how the school would handle the situation and recommended that administrators communicate with Champlin Elementary School to become familiar with the past issues of harassment that D.M.-B. had faced, and to consider how to avoid similar problems. Principal Sullivan assured D.M.-B.'s parents that Jackson Middle School would get D.M.-B.'s file from the elementary school and that there was no need for them to worry.

91. Several times throughout D.M.-B.'s tenure at Jackson Middle School, D.M.-B.'s parents asked officials at Jackson Middle School and the District whether the school or the District provided training to students and staff to address and prevent harassment of students perceived as LGBT. In each of those meetings, D.M.-B.'s parents urged the school and the District to adopt such training to stem the abuse that D.M.-B. was experiencing and offered specific suggestions for programs that one of D.M.-B's parents was familiar with through his work in a neighboring school district that had adopted successful character education programs. In each meeting, school officials claimed that such training would not be possible because such training was not necessary or was already encompassed within existing training – the details of which were never provided to D.M.-B.'s parents, despite repeated requests – or because no resources were currently available for such training.

92. Throughout D.M.-B.'s time at Jackson Middle School, Ms. Kesti was designated by administrators as the main point of contact for his family. She began

31

meeting regularly with D.M.-B after problems with harassment intensified near the middle of his sixth grade year.

93.     In the sixth grade, D.G. and another boy named Q.F. and their group of friends resumed harassing D.M.-B. based on the perception that he is gay and gender non-conforming.  They and other students frequently called D.M.-B. names such as "fag," "homo," "gay boy," and "Gaymian," particularly during the "passing period" between classes.

94.     Physical harassment of D.M.-B. intensified in the sixth grade as well. Other students sometimes "book-dropped" D.M.-B. (knocking his books out of his arms) and pushed him in the hallways.

95.     On one occasion D.G. stabbed D.M.-B. in the neck with a pencil. Associate Principal Udager notified D.M.-B.'s parents about that incident.  She indicated that school officials would "look into it" and said that they were going to try to keep D.M.-B. and his attacker as separate as possible but D.G. continued to harass D.M.-B.

96.     Several months into D.M.-B.'s sixth grade year, his parents learned that the harassment was continuing.  They immediately alerted Ms. Kesti, Principal Sullivan, and Associate Principal Anita Udager.

97.     Even after these complaints, D.G. continued to harass D.M-B.  For example, on one occasion D.G. grabbed D.M.-B. by his throat, pushing him up against the wall and choking him, in the school bathroom.

98.     Additionally, during his sixth grade year, some girls in D.M.-B.'s gym class began harassing him about his involvement in gymnastics because they viewed it as a "girls' sport." Comments directed at D.M.-B. about his involvement in gymnastics included the suggestion that he is "flexible enough to suck his own penis."

99.     D.M.-B.'s parents alerted Ms. Kesti about the harassment D.M.-B. was experiencing in gym class. The gym teacher was also aware of the harassment and made some efforts to help the students gain appreciation for gymnastics, but those efforts were unsuccessful. School officials appeared to take no adequate action to counter that harassment, and it continued.

100.    In the seventh grade, the harassment of D.M.-B., both verbal and physical, grew worse. D.M.-B. recalls that at least 10 times per week other students would shove him in the hallways or call him names such as "Gaymian," "gay boy," and "fag." On one occasion a student called him anti-gay slurs, including saying to him, "your dads are gay, so you're going to be gay, so why don't you just go suck your dads' cocks."

101.    The harassment took a significant toll on D.M.-B. as the seventh grade progressed. In the sixth grade D.M.-B. made the honor roll, but by the middle of seventh grade his grades started to slip. He began turning in incomplete homework assignments or failing to do homework at all. He also began showing signs of serious emotional distress. D.M.-B. began to have serious tantrums in which he would scream, cry, punch himself, punch the wall, and throw himself on the floor. The only way his parents could stop the tantrums was to physically restrain him. The only time D.M.-B.'s parents had

seen him engage in such behavior previously was around the time he first came into their home at six years old.  D.M.-B. was also sleeping poorly and engaging in destructive behaviors.  Through extensive conversations, his parents attempted to learn what was causing this regressive behavior, and D.M.-B. finally admitted that the harassment had become unbearable.  D.M.-B.'s parents promptly found him a private counselor, whom he began seeing regularly, to help him process the emotional trauma caused by the harassment.

102.    After D.M.-B.'s parents learned that other students were still harassing D.M.-B. at school, they contacted Ms. Kesti; Brian Carlson, the Associate Principal for seventh graders at Jackson Middle School; and Principal Sullivan.  They spoke with Ms. Kesti and Associate Principal Carlson several times about their concerns.  D.M.-B.'s parents told them about the ongoing anti-gay slurs and harassment in the bathroom and stressed that D.M.-B. did not feel safe in school.

103.    D.M.-B.'s parents copied Principal Sullivan on all their communications to Ms. Kesti and Associate Principal Carlson, but Principal Sullivan never responded to D.M.-B. or his parents.

104.    Near the end of spring break, D.M.-B. expressed to his parents that he did not want to return to Jackson Middle School.

105.    As a result of the persistent, worsening harassment and D.M.-B.'s parents' increasing alarm about the psychological toll it was taking on him, in the spring of D.M.-B.'s seventh grade year, on or around April 12, 2010, the school convened a meeting with

D.M.-B. and his parents and D.M.-B.'s teaching team, including his teaching team, as well as guidance counselor Ms. Kesti.

106.   In the April team meeting, D.M.-B.'s parents asked what the school was doing to educate students and prevent harassment of students perceived to be gay.  The administrators responded that D.M.-B.'s parents would have to raise that question with district-level staff.

107.   Approximately a month after the team meeting, in May 2010, D.M.-B.'s parents met with Superintendent Carlson and another District administrator, Greg Cole. In that meeting, Mr. Cole acknowledged to D.M.-B.'s parents that the District handles issues of racial harassment differently from harassment based on actual or perceived sexual orientation.  Superintendent Carlson and Mr. Cole also acknowledged that the District had no systemic approach in place to address harassment of students who were LGBT or perceived to be LGBT.

108.   In the summer after seventh grade, D.M.-B. was afraid to return to school because of the persistent harassment.  He asked his parents if he could be home-schooled, but they told him that would not be possible for the family and that D.M.-B. would have to return to Jackson Middle School for eighth grade.

109.   At the start of the eighth grade year, D.M.-B.'s parents again met informally with all of his teachers and explained that D.M.-B. was being raised by two fathers and that he had experienced chronic anti-gay and gender-based harassment since the fifth grade.

110.    The anti-gay and gender-based harassment against D.M-B. continued into his eighth grade.  Other students frequently called him anti-gay slurs, including "gay boy," "Gaymian," "faggot," "fag boy," "homo," "queer," and "daddy's boy."

111.    Sometimes the harassment took the form of mock sexual come-ons by other boys, in which the other student would touch D.M.-B.'s arm or leg in a sexually suggestive manner while calling him "Gaymian" or "fag boy."  On occasion another student would touch D.M.-B. in that manner and then shove him.

112.    The harassment sometimes happened within view of teachers who failed to stop or reprimand the harassers.  For instance, another student loudly called D.M.-B. "gay" in the hallway, and a teacher standing in the hallway looked at D.M.-B. but did not do anything.  At the beginning of the year, he also complained to teachers about harassment on several occasions and the teachers failed to intervene.

113.    D.M.-B.'s parents also continued to report the harassment to school officials.  On several occasions during D.M.-B.'s eighth grade year, his parents also spoke to the School Board at board meetings about the anti-gay and gender-based harassment and abuse suffered by D.M.-B.

114.    Once toward the beginning of his eighth grade year, D.M.-B., who is African-American, was called "nigger" by a classmate.  D.M.-B. reported this to his parents, and they instructed him to tell his counselor Ms. Kesti.  She immediately addressed the problem and the student who had called D.M.-B. the racial slur was punished.  Unlike the school's ineffectual attempts to address D.M.-B.'s sexual

orientation- and gender-based harassment, this intervention was effective:  D.M.-B. was not called racial slurs again.

115.    In February 2010, at his parents' request, the school convened another meeting of D.M.-B.'s teachers, along with Ms. Kesti and Associate Principal Anita Udager.  The teachers present claimed that they had been unaware of the harassment, despite having met with D.M.-B.'s parents earlier in the school year.

116.    In that meeting, D.M.-B.'s parents again suggested specific training, including diversity education, that the school could implement to prevent anti-gay and gender-based harassment like that D.M.-B. was experiencing.  They suggested that training for students and staff could be implemented with minimal effort or disruption during morning announcements and staff meetings.  Associate Principal Udager replied that "agendas are all already booked for our meetings," but that some of those would likely be possible.  However, the school never followed up with D.M.-B.'s parents about conducting training.

117.    During that meeting, D.M.-B.'s parents also asked the teachers and staff members in the room if they felt like they had received enough training from the district to deal with anti-gay harassment.  Nearly everyone in the room agreed that they had not received sufficient support or training to address anti-gay harassment.

118.    After the teachers left the room, D.M.-B., his parents, Ms. Kesti, Associate Principal Udager, and Ann Lindsey, a District employee, discussed the impact of the SOCP on the school's efforts to combat harassment.  Ms. Udager remained quiet while

the other school staff present agreed that the SOCP limits what the school can do to address anti-gay harassment.

119.    Although by the end of eighth grade, school staff were attempting to respond more diligently to D.M.-B.'s reports of harassment, those efforts failed to stop the harassment.  For example, in March of his eighth grade year, some other students in D.M.-B.'s geography class took D.M.-B.'s day planner and wrote "I like men!" in it.

120.    Toward the end of D.M.-B.'s eighth grade year, a student named J.R. encountered D.M.-B. in the hallway and started pushing D.M.-B., calling him "fag" and "homo."  J.R. and his friends then began harassing D.M.-B.'s regularly at lunch, calling them names like "fag."  In a typical exchange, J.R. would push D.M.-B., who would tell him to stop.  J.R. would respond, "what are you going to do about it, pussy?" and push him again.

121.    D.M.-B. first notified Associate Principal Udager, who said that she would "deal with it [the next] morning."  In reality the harassment continued even after several more reports to various administrators.  After nearly a week of incidents Associate Principal Udager finally disciplined J.R.  Even despite this action, J.R. continued to harass D.M.-B. by spreading rumors about seeing D.M.-B. "kissing a guy" to D.M.-B.'s friends and other students.

122.    Throughout his eighth grade year, D.M.-B. continued to suffer emotionally from the harassment he experienced throughout his time at Jackson Middle School.  He missed sleep, he was emotionally turbulent at times, began having regular, severe

headaches, he expressed that he "hated" going to school, and his grades continued to suffer.  He continued to see a private counselor to deal with the stress caused by the harassment.

123.    Teachers at Jackson Middle School have expressed to D.M.-B.'s parents that there is "no training and no resources" available to help them address bullying of students perceived as gay.  Teachers have told D.M.-B.'s parents that they are unsure how to handle anti-gay harassment due to the SOCP.  Associate Principal Udager has also told D.M.-B.'s parents that "we don't have staff time to address the problem."

124.    Jackson Middle School and the District have made no adequate effort to educate staff about issues of harassment of LGBT students or students perceived as LGBT or gender non-conforming.

125.    At no time during D.M.-B's tenure at Jackson Middle School, did the school or the District conduct training for students, teachers, or administrators addressing harassment of LGBT students or students perceived to be LGBT or gender non-conforming.

126.    D.M.-B. would like to attend Champlin Park High School within the District next year but is very hesitant to do so because of the unrelenting physical and verbal harassment he has suffered, which he expects to continue.

**The District's Anti-Gay Policies, Including the SOCP**

127.    For close to two decades, the District has maintained policies that expressly single out and stigmatize LGBT people, treating them, and only them, as unworthy of

39

even being discussed in school.  Through these policies and actions, the District has

perpetuated and helped create an environment that legitimizes perceptions that LGBT

students are outsiders who are different from and unequal to their peers.  In so doing, the

District has substantially contributed to and exacerbated the epidemic of anti-gay

harassment within its schools.  The District's policies impede efforts to curb harassment

and prevent school officials from complying with their constitutional and statutory

obligations to treat equally Plaintiffs and other students who are or are perceived to be

LGBT.

128.    The District's anti-gay policy originated in 1995 at the urging of an outside

group that eventually became known as the Parent Action League ("PAL").  PAL is still

in existence today.

129.    PAL's primary agenda is to promote anti-gay policies and practices within

the District, including so-called "reparative therapy" – an approach that maintains,

contrary to the conclusions of every major mental health organization in the nation, that

sexual orientation can be changed through counseling or other treatment.  PAL's leader

recently reaffirmed in an interview that PAL has urged the District to teach that gay

people can become heterosexual and to offer resources to LGBT students to lead them

out of the "homosexual lifestyle."  Among the "reparative therapy" resources that PAL

has promoted as appropriate for District students are Eagles' Wings Ministry, Outpost

Ministries, and Homosexuals Anonymous—all organizations that advocate that being gay

is a sin or against God's will.

130.   In 1995, PAL successfully advocated for the District to adopt a health curriculum policy prohibiting teachers from teaching that homosexuality is a "normal" or a "valid lifestyle."  According to PAL, the policy was necessary because "[t]he homosexual lifestyle does not reflect the community standards of District #11, nor is it regarded as a norm in society."

131.   At the same time, PAL succeeded in convincing the School Board to adopt other policies that would allow PAL to mobilize against any content within District schools that reflected positive views of LGBT people, regardless whether such content was necessary to present accurate information about a particular topic or to foster a safe and equal learning environment for LGBT students.  At PAL's urging, the District passed a policy requiring that schools "clearly identif[y]" any content related to lesbian, gay, or bisexual people included within any class—a requirement not imposed on any other type of educational materials.  Upon information and belief, PAL has used this policy over the years to monitor and censor material about LGBT issues within District schools and to prevent accurate information about LGBT people and issues from being presented.  Similarly, PAL successfully urged the District to remove LGBT support services, including the Gay and Lesbian Helpline for Youth and Adults, from District health resource lists.  These policies, and the influence that PAL exerts on the School Board, have played a substantial role in creating and perpetuating an atmosphere hostile to LGBT youth and those perceived to be LGBT within District schools.

132.    In 2009, shortly after the District settled an anti-gay harassment case, the School Board purported to change its policy against homosexuality.  The Board reworded the policy to state, in relevant part: "[t]eaching about sexual orientation is not a part of the District adopted curriculum; rather, such matters are best addressed within individual family homes, churches, or community organizations.  Anoka-Hennepin staff, in the course of their professional duties, shall remain neutral on matters regarding sexual orientation including but not limited to student led discussions."  The District terms this policy the "Sexual Orientation Curriculum Policy" or "SOCP."

133.    Although it purports to require "neutrality" on questions of sexual orientation, the SOCP in fact operates exclusively as an anti-gay policy, barring discussions of LGBT people from the classroom while imposing no similar restrictions on the discussion of heterosexuals or heterosexuality.  A District spokesperson recently confirmed that the SOCP does not require "neutrality" with respect to the topic of heterosexuality, but only with respect to "discussions of GLBT [gay, lesbian, bisexual, and transgender] issues."

134.    Moreover, the SOCP, which was borne out of PAL's anti-gay agenda, perpetuates anti-gay prejudice within District schools.  As with its prior iteration, the SOCP acts as a gag policy by barring school staff from discussing LGBT people or expressing the view, regardless of the purpose for doing so, that being gay, lesbian, or bisexual is a valid or normal "lifestyle."  In other words, District personnel are prevented from discussing or treating homosexuality or bisexuality in the same way that they treat

42

heterosexuality—that is, as an ordinary personal trait that many people share and that does not need to be "repaired."  The SOCP plainly and purposefully hamstrings school officials in any efforts to counter the hostile climate for LGBT students, at great expense to the well-being and education of Plaintiffs and other students who are LGBT or perceived to be LGBT and who face harassment by peers on that basis.

135.    As made clear not only from District-issued guidance but the enforcement of the policy, the SOCP acts to prevent even the most basic, factual information about LGBT people to be presented—or even discussed—within District schools.  A letter from Superintendent Carlson to the teachers' union to explain the scope of the SOCP, dated January 24, 2011, states that the mere mention by teachers that the American Psychological Association's official position is that sexual orientation is not a choice and that there is no scientific evidence that a person can change sexual orientation would violate the SOCP.  The same letter indicated that teaching about persecution of LGBT people in Nazi Germany is not permissible because "this fact is not a part of the District-adopted curriculum."  Teachers were not forbidden from referring to any other category of facts or group of people.

136.    In 2005, teachers on the history curriculum committee approved the addition of a unit about the way that the strategies used by the African American civil rights movement had influenced subsequent movements of "disenfranchised groups" to gain rights, and specifically named "LGBT" people as one of the groups.  In January 2010, however, District administrators refused to permit a teacher to show a film

detailing an act of civil disobedience by a lesbian couple who were refused a marriage license as part of a lesson plan on the impact of the African American model of civil rights on the LGBT rights movement because it would have violated the SOCP.  On March 30, 2011, in a meeting with members of the teachers' union, District administrator Barry Arrowsmith, who oversees the secondary social studies curriculum, informed the teachers that the District had unilaterally removed the reference to the LGBT movement from the curriculum because it violated the SOCP.

137.    The District has also applied the SOCP to limit the information about LGBT people that could be presented in a voluntary monthly diversity training program for teachers called SEED (Seeking Educational Equity and Diversity).  For the unit on anti-LGBT bias, SEED organizers initially selected a book entitled *Am I Blue?*, which included fiction and nonfiction writing about LGBT teens.  The School Board then issued guidance saying that SEED materials about sexual orientation could be only nonfiction; for discussions about other groups, however, there was no such restriction.  SEED organizers then selected a book entitled *How Homophobia Hurts Kids*, and District officials soon informed them that this book was not acceptable either, telling them that they had to "include an opposing viewpoint."  No such restriction was imposed on other topics of discussion.  SEED then selected a book entitled *Homosexuality: Opposing Viewpoints*, which finally passed muster at the District.

138.    The reach of the SOCP has even extended to bar students from presenting information about LGBT people as part of school assignments, even when such

information is appropriate and related to the curriculum.  For example, a teacher abruptly ended Plaintiff Jane Doe's presentation in a law class about the Equal Protection Clause when she mentioned an example involving a same-sex couple.  No other student's presentation was cut short.  Similarly, the District terminated a gay student's senior project consisting of a survey on the school climate for LGBT students, even though the project was supported by the student's teacher.

139.   The implementation of the SOCP, and its very existence, demean LGBT students, including Plaintiffs, by sending the unmistakable message that a core part of their identity is so controversial, shameful, or inappropriate that it may not be part of the dialogue about issues that fundamentally affect a school's students.  By singling out issues concerning LGBT people as inappropriate for discussion, the SOCP also perpetuates intolerance, hostility, and violence by other students against their peers who are perceived to be LGBT.

140.   The District's rigid insistence in preserving the SOCP violates its well-established legal obligations to provide equal educational opportunities to LGBT students or those perceived to be LGBT.  In light of the District's actual notice of the severe and pervasive anti-gay harassment suffered by Plaintiffs and other LGBT students, the continuation of the SOCP is unreasonable and serves no legitimate government interest.

## FIRST CLAIM FOR RELIEF

### U.S. Constitution Amendment XIV
### Denial of Equal Protection on the Basis of Sexual Orientation

(Brought by Jane Doe Pursuant to 42 U.S.C. § 1983 Against the School District; School Board; Dennis Carlson and Mike Farley, in their official capacities)

141.    Plaintiffs incorporate by reference all preceding paragraphs.

142.    Defendants, acting under color of state law, have deprived Jane Doe of the rights, privileges, or immunities secured by the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution, in that Defendants, without justification, have treated Jane Doe differently than other similarly situated students and student groups on the basis of actual or perceived sexual orientation.

143.    Defendants' policies single out gay, lesbian, and bisexual students, students with gay, lesbian, or bisexual parents, and students perceived as gay, lesbian, and bisexual for differential and adverse treatment on the basis of their or their parents' actual or perceived sexual orientation.  Defendants' policies prevent presentation of accurate information concerning gay, lesbian, and bisexual people even when such information serves important educational purposes, while imposing no similar restrictions on discussion of heterosexuality or heterosexual people.  The District's policy of banning wholesale the discussion of gay, lesbian, and bisexual people and issues from the classroom stigmatizes gay, lesbian, and bisexual students and those with gay, lesbian, or bisexual parents and denies them equal educational opportunities on the basis of their sexual orientation.

144.    Defendants' policies have substantially contributed to the creation of a pervasive anti-gay climate in the District and exacerbated the epidemic of anti-gay harassment in District schools.  By forbidding presentation of accurate information concerning gay, lesbian, and bisexual people, Defendants' policies prevent school officials from taking effective measures to prevent anti-gay harassment and from complying with their constitutional obligations to treat all students equally, without regard to actual or perceived sexual orientation.

145.    Defendants had actual notice that harassment based on actual or perceived sexual orientation was so severe, pervasive, and objectively offensive that it created a hostile climate that deprived Jane Doe of access to educational programs, activities, and opportunities.

146.    Defendants were deliberately indifferent to the harassment of Jane Doe based on actual or perceived sexual orientation in violation of Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution.  Defendants also failed to adequately train school staff about any policies prohibiting harassment and discrimination on the basis of actual or perceived sexual orientation.  Defendants' deliberate indifference and/or failure to train caused Jane Doe to be subjected to the described anti-gay discrimination and harassment.

147.    As an actual and proximate result of Defendants' conduct, Jane Doe has been injured and suffered damages to be determined according to proof.

148.  Jane Doe requests judgment in her favor against Defendants as set forth in the Prayer for Relief.

## SECOND CLAIM FOR RELIEF

### U.S. Constitution Amendment XIV
### Denial of Equal Protection on the Basis of Sexual Orientation

(Brought by K.R. Pursuant to 42 U.S.C. § 1983 Against the School District; School Board; Dennis Carlson and Jerri McGonigal, in their official capacities)

149.  Plaintiffs incorporate by reference all preceding paragraphs.

150.  Defendants, acting under color of state law, have deprived K.R. of the rights, privileges, or immunities secured by the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution, in that Defendants, without justification, have treated K.R. differently than other similarly situated students and student groups on the basis of actual or perceived sexual orientation.

151.  Defendants' policies single out gay, lesbian, and bisexual students, students with gay, lesbian, or bisexual parents, and students perceived as gay, lesbian, and bisexual for differential and adverse treatment on the basis of their or their parents' actual or perceived sexual orientation.  Defendants' policies prevent presentation of accurate information concerning gay, lesbian, and bisexual people even when such information serves important educational purposes, while imposing no similar restrictions on discussion of heterosexuality or heterosexual people.  The District's policy of banning wholesale the discussion of gay, lesbian, and bisexual people and issues from the classroom stigmatizes gay, lesbian, and bisexual students and those with gay, lesbian, or

bisexual parents and denies them equal educational opportunities on the basis of their sexual orientation.

152.   Defendants' policies have substantially contributed to the creation of a pervasive anti-gay climate in the District and exacerbated the epidemic of anti-gay harassment in District schools.  By forbidding presentation of accurate information concerning gay, lesbian, and bisexual people, Defendants' policies prevent school officials from taking effective measures to prevent anti-gay harassment and from complying with their constitutional obligations to treat all students equally, without regard to actual or perceived sexual orientation.

153.   Defendants had actual notice that harassment based on actual or perceived sexual orientation was so severe, pervasive, and objectively offensive that it created a hostile climate that deprived K.R. of access to educational programs, activities, and opportunities.

154.   Defendants were deliberately indifferent to the harassment of K.R. based on actual or perceived sexual orientation in violation of Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution.  Defendants also failed to adequately train school staff about any policies prohibiting harassment and discrimination on the basis of actual or perceived sexual orientation.  Defendants' deliberate indifference and/or failure to train caused K.R. to be subjected to the described anti-gay discrimination and harassment.

155.    As an actual and proximate result of Defendants' conduct, K.R. has been

injured and suffered damages to be determined according to proof.

156.    K.R. requests judgment in his favor against Defendants as set forth in the

Prayer for Relief.

### THIRD CLAIM FOR RELIEF

#### U.S. Constitution Amendment XIV
#### Denial of Equal Protection on the Basis of Sexual Orientation

(Brought by D.F. Pursuant to 42 U.S.C. § 1983 Against the School District; School
Board; Dennis Carlson and Jerri McGonigal, in their official capacities)

157.    Plaintiffs incorporate by reference all preceding paragraphs.

158.    Defendants, acting under color of state law, have deprived D.F. of the

rights, privileges, or immunities secured by the Equal Protection Clause of the Fourteenth

Amendment of the U.S. Constitution, in that Defendants, without justification, have

treated D.F. differently than other similarly situated students and student groups on the

basis of actual or perceived sexual orientation.

159.    Defendants' policies single out gay, lesbian, and bisexual students, students

with gay, lesbian, or bisexual parents, and students perceived as gay, lesbian, and

bisexual for differential and adverse treatment on the basis of their or their parents' actual

or perceived sexual orientation.  Defendants' policies prevent presentation of accurate

information concerning gay, lesbian, and bisexual people even when such information

serves important educational purposes, while imposing no similar restrictions on

discussion of heterosexuality or heterosexual people.  The District's policy of banning

wholesale the discussion of gay, lesbian, and bisexual people and issues from the classroom stigmatizes gay, lesbian, and bisexual students and those with gay, lesbian, or bisexual parents and denies them equal educational opportunities on the basis of their sexual orientation.

160.    Defendants' policies have substantially contributed to the creation of a pervasive anti-gay climate in the District and exacerbated the epidemic of anti-gay harassment in District schools.  By forbidding presentation of accurate information concerning gay, lesbian, and bisexual people, Defendants' policies prevent school officials from taking effective measures to prevent anti-gay harassment and from complying with their constitutional obligations to treat all students equally, without regard to actual or perceived sexual orientation.

161.    Defendants had actual notice that harassment based on actual or perceived sexual orientation was so severe, pervasive, and objectively offensive that it created a hostile climate that deprived D.F. of access to educational programs, activities, and opportunities.

162.    Defendants were deliberately indifferent to the harassment of D.F. based on actual or perceived sexual orientation in violation of Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution.  Defendants also failed to adequately train school staff about any policies prohibiting harassment and discrimination on the basis of actual or perceived sexual orientation.  Defendants' deliberate indifference

and/or failure to train caused D.F. to be subjected to the described anti-gay discrimination and harassment.

163.     As an actual and proximate result of Defendants' conduct, D.F. has been injured and suffered damages to be determined according to proof.

164.     D.F. requests judgment in his favor against Defendants as set forth in the Prayer for Relief.

## FOURTH CLAIM FOR RELIEF

### U.S. Constitution Amendment XIV
### Denial of Equal Protection on the Basis of Sexual Orientation

(Brought by B.G. Pursuant to 42 U.S.C. § 1983 Against the School District; School Board; Dennis Carlson, Jerri McGonigal, and Tom Hagerty, in their official capacities)

165.     Plaintiffs incorporate by reference all preceding paragraphs.

166.     Defendants, acting under color of state law, have deprived B.G. of the rights, privileges, or immunities secured by the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution, in that Defendants, without justification, have treated B.G. differently than other similarly situated students and student groups on the basis of actual or perceived sexual orientation.

167.     Defendants' policies single out gay, lesbian, and bisexual students, students with gay, lesbian, or bisexual parents, and students perceived as gay, lesbian, and bisexual for differential and adverse treatment on the basis of their or their parents' actual or perceived sexual orientation.  Defendants' policies prevent presentation of accurate information concerning gay, lesbian, and bisexual people even when such information

serves important educational purposes, while imposing no similar restrictions on discussion of heterosexuality or heterosexual people.  The District's policy of banning wholesale the discussion of gay, lesbian, and bisexual people and issues from the classroom stigmatizes gay, lesbian, and bisexual students and those with gay, lesbian, or bisexual parents and denies them equal educational opportunities on the basis of their sexual orientation.

168.   Defendants' policies have substantially contributed to the creation of a pervasive anti-gay climate in the District and exacerbated the epidemic of anti-gay harassment in District schools.  By forbidding presentation of accurate information concerning gay, lesbian, and bisexual people, Defendants' policies prevent school officials from taking effective measures to prevent anti-gay harassment and from complying with their constitutional obligations to treat all students equally, without regard to actual or perceived sexual orientation.

169.   Defendants had actual notice that harassment based on actual or perceived sexual orientation was so severe, pervasive, and objectively offensive that it created a hostile climate that deprived B.G. of access to educational programs, activities, and opportunities.

170.   Defendants were deliberately indifferent to the harassment of B.G. based on actual or perceived sexual orientation in violation of Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution.  Defendants also failed to adequately train school staff about any policies prohibiting harassment and discrimination on the

basis of actual or perceived sexual orientation.  Defendants' deliberate indifference and/or failure to train caused B.G. to be subjected to the described anti-gay discrimination and harassment.

171.   As an actual and proximate result of Defendants' conduct, B.G. has been injured and suffered damages to be determined according to proof.

172.   B.G. requests judgment in her favor against Defendants as set forth in the Prayer for Relief.

## FIFTH CLAIM FOR RELIEF

### U.S. Constitution Amendment XIV
### Denial of Equal Protection on the Basis of Sexual Orientation

(Brought by D.M.-B. Pursuant to 42 U.S.C. § 1983 Against the School District; School Board; Dennis Carlson and Tom Hagerty, in their official capacities)

173.   Plaintiffs incorporate by reference all preceding paragraphs.

174.   Defendants, acting under color of state law, have deprived D.M.-B. of the rights, privileges, or immunities secured by the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution, in that Defendants, without justification, have treated D.M.-B. differently than other similarly situated students and student groups on the basis of actual or perceived sexual orientation.

175.   Defendants' policies single out gay, lesbian, and bisexual students, students with gay, lesbian, or bisexual parents, and students perceived as gay, lesbian, and bisexual for differential and adverse treatment on the basis of their or their parents' actual or perceived sexual orientation.  Defendants' policies prevent presentation of accurate

information concerning gay, lesbian, and bisexual people even when such information serves important educational purposes, while imposing no similar restrictions on discussion of heterosexuality or heterosexual people.  The District's policy of banning wholesale the discussion of gay, lesbian, and bisexual people and issues from the classroom stigmatizes gay, lesbian, and bisexual students and those with gay, lesbian, or bisexual parents and denies them equal educational opportunities on the basis of their sexual orientation.

176.   Defendants' policies have substantially contributed to the creation of a pervasive anti-gay climate in the District and exacerbated the epidemic of anti-gay harassment in District schools.  By forbidding presentation of accurate information concerning gay, lesbian, and bisexual people, Defendants' policies prevent school officials from taking effective measures to prevent anti-gay harassment and from complying with their constitutional obligations to treat all students equally, without regard to actual or perceived sexual orientation.

177.   Defendants had actual notice that harassment based on actual or perceived sexual orientation was so severe, pervasive, and objectively offensive that it created a hostile climate that deprived D.M.-B. of access to educational programs, activities, and opportunities.

178.   Defendants were deliberately indifferent to the harassment of D.M.-B. based on actual or perceived sexual orientation in violation of Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution.  Defendants also failed to

adequately train school staff about any policies prohibiting harassment and discrimination

on the basis of actual or perceived sexual orientation.  Defendants' deliberate indifference

and/or failure to train caused D.M.-B. to be subjected to the described anti-gay

discrimination and harassment.

179.    As an actual and proximate result of Defendants' conduct, D.M.-B. has

been injured and suffered damages to be determined according to proof.

180.    D.M.-B. requests judgment in his favor against Defendants as set forth in

the Prayer for Relief.

## SIXTH CLAIM FOR RELIEF

### Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*
### Discrimination Based on Sex

(Brought by K.R. Pursuant to 20 U.S.C. § 1681 Against the School District; School
Board; Dennis Carlson and Jerri McGonigal, in their official capacities)

181.    Plaintiffs incorporate by reference all preceding paragraphs.

182.    The School District and each school within the District attended by K.R.

are recipients of federal financial assistance.

183.    The acts and omissions of Defendants violated K.R.'s rights under Title IX

by discriminating against him on the basis of sex.

184.    Defendants had actual notice that harassment based on sex was so severe,

pervasive, and objectively offensive that it created a hostile climate based on sex that

deprived K.R. of access to educational programs, activities, and opportunities.

185.    Defendants exhibited deliberate indifference to the harassment of K.R. based on sex in violation of Title IX.  This indifference caused K.R. to be subjected to the described sex discrimination and gender-based harassment.

186.    Defendants violations of Title IX were the actual, direct, and proximate cause of injuries suffered by K.R. as alleged.

187.    K.R. requests judgment in his favor against Defendants as set forth in the Prayer for Relief.

## SEVENTH CLAIM FOR RELIEF

### Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* Discrimination Based on Sex

(Brought by D.F. Pursuant to 20 U.S.C. § 1681 Against the School District; School Board; Dennis Carlson and Jerri McGonigal, in their official capacities)

188.    Plaintiffs incorporate by reference all preceding paragraphs.

189.    The School District and each school within the District attended by D.F. are recipients of federal financial assistance.

190.    The acts and omissions of Defendants violated D.F.'s rights under Title IX by discriminating against him on the basis of sex.

191.    Defendants had actual notice that harassment based on sex was so severe, pervasive, and objectively offensive that it created a hostile climate based on sex that deprived D.F. of access to educational programs, activities, and opportunities.

192.    Defendants exhibited deliberate indifference to the harassment of D.F. based on sex in violation of Title IX.  This indifference caused D.F. to be subjected to the described sex discrimination and gender-based harassment.

193.    Defendants violations of Title IX were the actual, direct, and proximate cause of injuries suffered by D.F. as alleged.

194.    D.F. requests judgment in his favor against Defendants as set forth in the Prayer for Relief.

## EIGHTH CLAIM FOR RELIEF

**Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*
Discrimination Based on Sex**

(Brought by B.G. Pursuant to 20 U.S.C. § 1681 Against the School District; School Board; Dennis Carlson, Jerri McGonigal, and Tom Hagerty, in their official capacities)

195.    Plaintiffs incorporate by reference all preceding paragraphs.

196.    The School District and each school within the District attended by B.G. are recipients of federal financial assistance.

197.    The acts and omissions of Defendants violated B.G.'s rights under Title IX by discriminating against her on the basis of sex.

198.    Defendants had actual notice that harassment based on sex was so severe, pervasive, and objectively offensive that it created a hostile climate based on sex that deprived B.G. of access to educational programs, activities, opportunities.

199.   Defendants exhibited deliberate indifference to the harassment of B.G. based on sex in violation of Title IX.  This indifference caused B.G. to be subjected to the described sex discrimination and gender-based harassment.

200.   Defendants violations of Title IX were the actual, direct, and proximate cause of injuries suffered by B.G. as alleged.

201.   B.G. requests judgment in her favor against Defendants as set forth in the Prayer for Relief.

## NINTH CLAIM FOR RELIEF

**Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*
Discrimination Based on Sex**

(Brought by D.M.-B.  Pursuant to 20 U.S.C. § 1681 Against the School District; School Board; Dennis Carlson and Tom Hagerty, in their official capacities)

202.   Plaintiffs incorporate by reference all preceding paragraphs.

203.   The School District and each school within the District attended by D.M.-B.  are recipients of federal financial assistance.

204.   The acts and omissions of Defendants violated D.M.-B.'s rights under Title IX by discriminating against him on the basis of sex.

205.   Defendants had actual notice that harassment based on sex was so severe, pervasive, and objectively offensive that it created a hostile climate based on sex that deprived D.M.-B. of access to educational programs, activities, and opportunities.

206.    Defendants exhibited deliberate indifference to the harassment of D.M.-B. based on sex in violation of Title IX.  This indifference caused D.M.-B.  to be subjected to the described sex discrimination and gender-based harassment.

207.    Defendants violations of Title IX were the actual, direct, and proximate cause of injuries suffered by D.M.-B. as alleged.

208.    D.M.-B. requests judgment in his favor against Defendants as set forth in the Prayer for Relief.

## TENTH CLAIM FOR RELIEF

### Minnesota Human Rights Act, Minn. Stat. § 363A.13-.14
### Discrimination on the Basis of Sexual Orientation

(Brought by Jane Doe Pursuant to the Minnesota Human Rights Act Against the School District; School Board; Dennis Carlson and Mike Farley, in their official capacities)

209.    Plaintiffs incorporate by reference all preceding paragraphs.

210.    The acts and omissions of Defendants violated Jane Doe's rights under the Minnesota Human Rights Act by discriminating against her full utilization and benefit of an educational institution on the basis of sexual orientation.

211.    Defendants had actual notice that its policies and practices constituted discriminatory acts and omissions and the effect such policies and practices had on Jane Doe's ability to utilize and benefit from an educational institution.

212.    Defendants had actual notice that harassment based on sexual orientation was so severe, pervasive, and objectively offensive that it created a hostile climate based

on sexual orientation that deprived Jane Doe of full utilization and benefit of an educational institution on the basis of sexual orientation.

213.   Defendants aided, abetted, and incited discrimination against Jane Doe based on sexual orientation that prevented her full utilization of and benefit from an educational institution.

214.   Defendants violation of the Minnesota Human Rights Act were the actual, direct, and proximate cause of injuries suffered by Jane Doe as alleged.

215.   Jane Doe requests judgment in her favor against Defendants as set forth in the Prayer for Relief.

## ELEVENTH CLAIM FOR RELIEF

### Minnesota Human Rights Act, Minn. Stat. § 363A.13-.14
### Discrimination on the Basis of Sexual Orientation

(Brought by K.R. Pursuant to the Minnesota Human Rights Act Against the School District; School Board; Dennis Carlson and Jerri McGonigal, in their official capacities)

216.   Plaintiffs incorporate by reference all preceding paragraphs.

217.   The acts and omissions of Defendants violated K.R.'s rights under the Minnesota Human Rights Act by discriminating against his full utilization and benefit of an educational institution on the basis of perceived sexual orientation.

218.   Defendants had actual notice that its policies and practices constituted discriminatory acts and omissions and the effect such policies and practices had on K.R.'s ability to utilize and benefit from an educational institution.

219.    Defendants had actual notice that harassment based on sexual orientation was so severe, pervasive, and objectively offensive that it created a hostile climate based on sexual orientation that deprived K.R. of full utilization and benefit of an educational institution on the basis of perceived sexual orientation.

220.    Defendants aided, abetted, and incited discrimination against K.R. based on perceived sexual orientation that prevented his full utilization of and benefit from an educational institution.

221.    Defendants violation of the Minnesota Human Rights Act were the actual, direct, and proximate cause of injuries suffered by K.R. as alleged.

222.    K.R. requests judgment in his favor against Defendants as set forth in the Prayer for Relief.

### TWELFTH CLAIM FOR RELIEF

**Minnesota Human Rights Act, Minn. Stat. § 363A.13-.14**
**Discrimination on the Basis of Sexual Orientation**

(Brought by D.F. Pursuant to the Minnesota Human Rights Act Against the School District; School Board; Dennis Carlson and Jerri McGonigal, in their official capacities)

223.    Plaintiffs incorporate by reference all preceding paragraphs.

224.    The acts and omissions of Defendants violated D.F.'s rights under the Minnesota Human Rights Act by discriminating against his full utilization and benefit of an educational institution on the basis of sexual orientation.

225.    Defendants had actual notice that its policies and practices constituted discriminatory acts and omissions and the effect such policies and practices had on D.F.'s ability to utilize and benefit from an educational institution.

226.    Defendants had actual notice that harassment based on sexual orientation was so severe, pervasive, and objectively offensive that it created a hostile climate based on sexual orientation that deprived D.F. of full utilization and benefit of an educational institution on the basis of sexual orientation.

227.    Defendants aided, abetted, and incited discrimination against D.F. based on sexual orientation that prevented his full utilization of and benefit from an educational institution.

228.    Defendants violation of the Minnesota Human Rights Act were the actual, direct, and proximate cause of injuries suffered by D.F. as alleged.

229.    D.F. requests judgment in his favor against Defendants as set forth in the Prayer for Relief.

### THIRTEENTH CLAIM FOR RELIEF

**Minnesota Human Rights Act, Minn. Stat. § 363A.13-.14**
**Discrimination on the Basis of Sexual Orientation**

(Brought by B.G. Pursuant to the Minnesota Human Rights Act Against the School District; School Board; Dennis Carlson, Jerri McGonigal, and Tom Hagerty, in their official capacities)

230.    Plaintiffs incorporate by reference all preceding paragraphs.

231.    The acts and omissions of Defendants violated B.G.'s rights under the

Minnesota Human Rights Act by discriminating against her full utilization and benefit of

an educational institution on the basis of sexual orientation.

232.    Defendants had actual notice that its policies and practices constituted

discriminatory acts and omissions and the effect such policies and practices had on

B.G.'s ability to utilize and benefit from an educational institution.

233.    Defendants had actual notice that harassment based on sexual orientation

was so severe, pervasive, and objectively offensive that it created a hostile climate based

on sexual orientation that deprived B.G. of full utilization and benefit of an educational

institution on the basis of sexual orientation.

234.    Defendants aided, abetted, and incited discrimination against B.G. based on

sexual orientation that prevented her full utilization of and benefit from an educational

institution.

235.    Defendants' violation of the Minnesota Human Rights Act were the actual,

direct, and proximate cause of injuries suffered by B.G. as alleged.

236.    B.G. requests judgment in her favor against Defendants as set forth in the

Prayer for Relief.

## FOURTEENTH CLAIM FOR RELIEF

**Minnesota Human Rights Act, Minn. Stat. § 363A.13-.14**
**Discrimination on the Basis of Sexual Orientation**

(Brought by D.M.-B. Pursuant to the Minnesota Human Rights Act Against the
School District; School Board; Dennis Carlson and Tom Hagerty, in their official
capacities)

237.    Plaintiffs incorporate by reference all preceding paragraphs.

238.    The acts and omissions of Defendants violated D.M.-B.'s rights under the Minnesota Human Rights Act by discriminating against his full utilization and benefit of an educational institution on the basis of perceived sexual orientation.

239.    Defendants had actual notice that its policies and practices constituted discriminatory acts and omissions and the effect such policies and practices had on D.M.-B.'s ability to utilize and benefit from an educational institution.

240.    Defendants had actual notice that harassment based on sexual orientation was so severe, pervasive, and objectively offensive that it created a hostile climate based on sexual orientation that deprived D.M.-B. of full utilization and benefit of an educational institution on the basis of perceived sexual orientation.

241.    Defendants aided, abetted, and incited discrimination against D.M.-B. based on sexual orientation that prevented his full utilization of and benefit from an educational institution.

242.    Defendants violation of the Minnesota Human Rights Act were the actual, direct, and proximate cause of injuries suffered by D.M.-B. as alleged.

243.    D.M.-B. requests judgment in his favor against Defendants as set forth in the Prayer for Relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully prays that this Court enter judgment in its favor and against Defendants, providing the following relief:

1.  Order granting an injunction restraining and enjoining Defendants from enforcing the Anoka-Hennepin School District's Sexual Orientation Curriculum Policy, 604.11, adopted on February 9, 2009.

2.  Order granting all Plaintiffs nominal, compensatory, and punitive damages against Defendants for violations of the Equal Protection Clause of the 14th Amendment of the United States Constitution.

3.  Order granting K.R. nominal, compensatory, and punitive damages against Defendants for violations of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq.

4.  Order granting D.F. nominal, compensatory, and punitive damages against Defendants for violations of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq.

5.  Order granting B.G. nominal, compensatory, and punitive damages against Defendants for violations of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq.

6.  Order granting D.M.-B. nominal, compensatory, and punitive damages against Defendants for violations of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq.

7.  Order granting all Plaintiffs nominal, compensatory, and punitive damages against Defendants for violations of the Minnesota Human Rights Act, Minn. Stat. § 363A.13-.14, as well as other available relief identified in Minn. Stat. §§ 363A.33, Subd. 6 and 363A.29, Subd. 4.

8.  Order granting an injunction restraining and enjoining Defendants from failing to adequately protect Plaintiffs, and other similarly situated students, from verbal and physical harassment within the school district.

9.  Issue an injunction ordering Defendants to stop engaging in such unconstitutional and unlawful acts, and to develop policies and procedures for ending any such unconstitutional and unlawful acts and the hostile and intolerant environment, including but not limited to the following:

    a.      Require Defendants to implement mandatory and effective training programs for District faculty, staff, and students on issues relating to diversity, homophobia, and methods to intervene to stop students from harassing other students who are LGBT or gender non-conforming or who are perceived to be LGBT or gender non-conforming;

     b.     Require Defendants to adopt policies with specific guidelines for instructing teachers, security guards, and administrators about how to address complaints by students who have been taunted, harassed, or discriminated against because of their actual or perceived sexual orientation or gender identity or expression;

     c.     Require Defendants to conduct immediately assemblies for all students addressing issues of diversity, homophobia, and tolerance, wherein students are instructed about laws prohibiting harassment and discrimination based on actual or perceived sexual orientation or gender identity or expression;

     d.     Require Defendants to assign a peer mediator and/or other staff member to District schools to provide active monitoring for the school and to address immediately instances of harassment and/or discrimination that arise at the school;

     e.     Require Defendants to maintain statistical data concerning each complaint of harassment based on actual or perceived sexual orientation and gender identity or expression made by a student or staff member, as well as the specific action District teachers, security guards, and/or administrators took to resolve that complaint;

     f.     Require Defendants to take no reprisal or retaliatory action against any Plaintiff or any administrator, teacher or staff member who speaks out in support of Plaintiffs.

10. For interest, where appropriate, on any damages awarded to any plaintiff.

11. For attorneys' fees, expenses, and costs incurred in the prosecution of this action pursuant to, *inter alia*, 42 U.S.C. § 1988 and other applicable laws.

12. For any other and further relief as the Court may deem just and proper.


**RESPECTFULLY SUBMITTED,**

Dated: July 21, 2011

FAEGRE & BENSON LLP

s/ Michael A. Ponto

Michael A. Ponto, #203944
 mponto@faegre.com
Martin S. Chester, #031514X
 mchester@faegre.com
Christopher H. Dolan, #0386484
 cdolan@faegre.com
Zack L. Stephenson, #0391533
 Zstephenson@faegre.com
2200Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
(612) 766-7000

SOUTHERN POVERTY LAW CENTER
Mary Bauer*
Christine P. Sun*
Samuel Wolfe*
400 Washington Avenue
Montgomery, AL 36104
(334) 956-8200

NATIONAL CENTER FOR LESBIAN RIGHTS
Christopher Stoll*
Ilona M. Turner*
870 Market Street, Sutie 370
San Francisco, CA 94102
(415) 365-1335

*Motion for admission *pro hac vice* forthcoming

**ATTORNEYS FOR PLAINTIFFS**

fb.us.7057179.03